UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
BARBARA BRUNO and JOSEPH BRUNO,

                        MEMORANDUM AND ORDER

         Plaintiffs,              CV 15-6129

    -against-                (Wexler, J.)

ZIMMER, INC., ZIMMER US, INC.,
ZIMMER BIOMET HOLDINGS, INC.
and ZIMMER CEP USA HOLDING CO.,

         Defendants.

----------------------------------------------------------X

APPEARANCES:

    THE CLANCY LAW FIRM, P.C.
    BY:   Donna H. Clancy, Esq.
    Attorneys for Plaintiffs
    40 Wall Street, 29th Floor
    New York, NY 10005

    FAEGRE BAKER DANIELS LLP
    BY:   Adrienne Franco Busby, Esq.
    Attorneys for Defendants
    300 North Meridian Street, Suite 2700
    Indianapolis, IN 46204

    FAEGRE BAKER DANIELS LLP
    BY:   Caroline H. Sear, Esq.
    Attorneys for Defendants
    311 South Wacker Drive, Suite 4300
    Chicago, IL 60606

    McCARTER & ENGLISH, LLP
    BY:   Renee A. Gallagher, Esq.
    Attorneys for Defendants
    245 Park Avenue, 27th Floor
    New York, NY 10167

WEXLER, District Judge:

This is a products liability action that rises out of Plaintiff's hip replacement surgery involving one or more implant devices manufactured by Defendants. Before the Court is Defendants' partial motion to dismiss, seeking to dismiss Counts 4, 5, 6, 7 and 9 of the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff opposes the motion. For the following reasons, Defendants' motion is granted.

BACKGROUND

On or about June 1, 2010, Plaintiff Barbara Bruno ("Bruno") underwent a total arthroplasty of her left hip with insertion of the Zimmer Versys Femoral Hip System Femoral Head 12/14 Taper ("Zimmer Versys") and the Zimmer M/L Taper Prosthesis with Kinectiv Modular Neck ("Zimmer M/L") (collectively, the "hip joint implant products"), designed, manufactured and distributed by Defendants. (Am. Compl. ¶ 29, 33.) The surgery was performed by Dr. Douglas M. Petraco ("Dr. Petraco") at St. Charles Hospital in Port Jefferson, New York. (1st Am. Compl. ¶ 33.)

Initially, the surgery was successful in eliminating Bruno's pain and restrictions. (Id. ¶ 35.) However, in or about February 2013, Bruno began experiencing a recurrence of pain in her left leg and hip, which progressively worsened over time.[1] (Id. ¶ 43.) Bruno's treating orthopedist, Dr. Calin S. Moucha ("Dr. Moucha"), administered a cortisone injection in Bruno's left hip to help alleviate the pain in September 2013. (Id. ¶¶ 44-45.) On or about November 13,

---

[1] Prior to this, in or about November 2012, Bruno was diagnosed with breast cancer and underwent a partial mastectomy, as well as radiation therapy. (Am. Compl. ¶¶ 38-42.)

2013, during a follow-up appointment with her oncologist, Dr. Julie Fasano ("Dr. Fasano"), for her prior breast cancer, Bruno reported the leg pain she had been experiencing. (Id. ¶ 46.). Approximately one week later, Dr. Fasano ordered a CT scan of Bruno's pelvis to be performed at Memorial Hospital for Cancer and Allied Diseases ("MHCAD"). (Id. ¶ 47.)

The results of Bruno's pelvic scan showed fluid surrounding the Zimmer hip joint implant products and were suspicious for hemorrhagic, inflammatory or infectious synovitis and/or bursitis. (Id. ¶ 48.) The findings were confirmed through a subsequent fluoro aspiration and MRI. (Id.) Based on the results of her scan, Dr. Steven M. Sugarman ("Dr. Sugarman"), Chief of Commack Medical Oncology Service at MHCAD, advised Bruno to see her orthopedic surgeon as soon as possible and to go to the nearest emergency room if she was not feeling well or developed a fever. (Id. ¶ 49.)

On or about November 27, 2013, Bruno underwent several blood tests at Mt. Sinai Hospital, which showed abnormally high levels of hemoglobin and C reactive protein in Bruno's blood. (Id. ¶ 50.) Such findings correlated with an increased cardiovascular risk and indicated inflammation or infection. (Id.) Bruno's serum cobalt levels were also found to be abnormally high. (Id. ¶ 51.)

Based on her blood tests and scans, Dr. Moucha diagnosed Bruno with periprosthetic left hip infection caused by debris from corrosion due to modular implants. (Id. ¶ 52.) On or about December 20, 2013, Bruno underwent an aspiration of her left hip, which revealed fluid collection from the posterior joint capsule into the greater trochanteric bursa. (Id. ¶ 53.) On or about December 31, 2013, Bruno underwent a second aspiration of her left hip and Dr. Moucha diagnosed her with metallosis resulting from her previous hip replacement surgery involving the

Zimmer hip joint implant products. (Id. ¶ 54.) Dr. Moucha advised Bruno that removal of the hip implant was necessary. (Id.)

In or about September 2013, Bruno underwent a CT scan of her chest, which found an aortic aneurysm. (Id. ¶ 55.) In or about October 2013, Dr. Leonard N. Girardi ("Dr. Girardi") of Weill Cornell Cardiothoracic Surgery advised Bruno that she needed to have the aortic aneurysm repaired, as well as an aortic valve resuspension. (Id. ¶ 56.) On February 25, 2014, Bruno underwent aortic aneurysm repair and aortic valve resuspension. (Id. ¶ 57.)

During her post-operative cardiac treatment, Bruno continued to experience extreme and debilitating pain in her left hip, groin and buttock. (Id. ¶ 59.) However, Dr. Girardi advised Bruno that she needed to wait three months after the cardiac surgery for medical clearance to undergo another hip surgery. (Id.)

On or about June 19, 2014, Bruno underwent revision surgery to her left hip, during which one or more of the Zimmer hip joint implant products was removed. (Id. ¶ 62.) Following the surgery, Dr. Moucha explained to Plaintiffs that it had been necessary to remove significant muscle from Bruno's left hip area due to fluid collection and related infection in the area surrounding the original hip implant. (Id. ¶ 63.) Once the Zimmer hip joint implant products were removed from Bruno's left hip, her blood tests showed a significant decrease in the levels of cobalt and other metals that had previously been found in her blood. (Id. ¶ 64.)

Following the revision surgery, Bruno required assistance with all aspects of daily living and was able to ambulate only with the assistance of a walker. (Id. ¶ 65.) Thereafter, Bruno began physical therapy, which was helpful in increasing the mobility of her left hip. (Id. ¶¶ 66-67.) However, Bruno then began experiencing pain in her right hip. (Id. ¶ 67.) Dr. Moucha

advised Bruno that the pain in her right hip was likely due to arthritis as well as having to use her right leg more to compensate for the decreased mobility in her left hip. (Id. ¶ 68.) Dr. Moucha determined that Bruno required hip replacement surgery of her right hip. (Id.)

In or about November 2014, Bruno underwent a hip replacement with respect to her right hip. (Id. ¶ 69.) Bruno still requires physical therapy for both of her hips. (Id. ¶ 70.) Bruno's physicians have advised her that she is permanently disabled. (Id. ¶ 71.) Due to her disabilities, Bruno has been unable to work or earn any income. (Id. ¶ 72.)

Plaintiffs Barbara Bruno and her husband, Joseph, commenced the within action on October 26, 2015. The parties thereafter stipulated to allow Plaintiffs to file an Amended Complaint on January 12, 2016. Defendants now move to dismiss the following five causes of action from the First Amended Complaint: (1) negligent misrepresentation; (2) fraudulent misrepresentation; (3) breach of express warranty; (4) intentional infliction of emotional distress; and, (5) the request for punitive damages.

## DISCUSSION

I.   Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Facial plausibility" is achieved when the "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). As a general rule, the court is required to accept

as true all of the allegations contained in the complaint. See Iqbal, 556 U.S. at 678; Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." Iqbal, 556 U.S. at 678-79 (citation omitted); see also Twombly, 555 U.S. at 555 (stating that the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," which state a claim for relief. Iqbal, 556 U.S. at 679. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. Iqbal, 556 U.S. at 678 (quoting Twombly, 555 U.S. at 557).

II.     Fraudulent and Negligent Misrepresentation

Under New York law, the elements of a fraud claim are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by defendant, (2) made for the purpose of inducing the other party to rely on it, (3) justifiable reliance of the other party on the misrepresentation or material omission, and (4) injury." Premium Mortgage Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009) (citations omitted). "Negligent misrepresentation involves most of the same elements as fraud, with a negligence standard substituted for the scienter requirement." Meisel v. Grunberg, 651 F. Supp. 2d 98, 123 (S.D.N.Y. 2009) (citation omitted). Specifically, to state a claim for negligent misrepresentation, a plaintiff must allege that: "(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the

information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000).

When pleading a fraud claim, Federal Rule of Civil Procedure 9(b) requires that the allegations be pleaded with particularity. See Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996). The Second Circuit has held that where a complaint charges fraud, "it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Id. (citing Shields v. Citytrust Bancorp., Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (additional citation omitted). Put another way, a plaintiff claiming fraud "must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation." Bertini v. Smith & Nephew, Inc., 8 F. Supp. 3d 246, 259 (E.D.N.Y. 2014) (citation and internal quotation marks omitted). "Like fraud, negligent misrepresentation claims must [also] comport with Rule 9(b)." Boco v. Argent Mortgage Company, LLC, No. 13-CV-1165, 2014 U.S. Dist. LEXIS 43993, at *17 (E.D.N.Y. Mar. 31, 2014) (citing Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 583 (2d Cir. 2005)) (additional citations omitted).

Plaintiffs' fraudulent and negligent misrepresentation claims fail to meet the particularity standard required by Rule 9(b). The Amended Complaint lists various alleged misrepresentations without any indication of who made them, where or when they were made or in what manner they were communicated.

Moreover, Plaintiffs fail to adequately plead reliance, a required element of both fraudulent and negligent misrepresentation. With respect to the fraudulent misrepresentation claim, Plaintiffs simply state that "[i]n reliance on Zimmer's representations, Barbara Bruno and her physicians were induced to, and did, use Zimmer's hip joint implant in hip replacement surgery." (1st Am. Compl. ¶ 118.) However, "the mere fact that [Plaintiffs] purchased the [hip joint implant] does not show that [Plaintiffs] or [their] physician actually relied on defendant[s'] alleged misrepresentations and omissions when deciding whether to proceed with [Bruno's] surgery." Bertini, 8 F. Supp. 3d at 259 (citing Pacs Indus., Inc. v. Cutler-Hammer, Inc., 103 F. Supp. 2d 570, 572 (E.D.N.Y. 2000)). Plaintiffs' negligent misrepresentation claim fares no better since the sole allegation of reliance contained in that claim is that "Barbara Bruno's reliance on Zimmer's representation was justified." (1st Am. Compl. ¶ 134.) This is wholly inadequate to satisfy the pleading standard for reliance. "Without pleading reliance, plaintiffs' fraudulent [and negligent] misrepresentation and omission claim[s] cannot stand." Bertini, 8 F. Supp. 3d at 259 (citing cases).

Rather than address the particularity and reliance arguments advanced by Defendants in their motion, Plaintiffs, for the first time, now argue that Bruno's physician, Dr. Petraco, was "effectively Zimmer's agent," and that his endorsement of the hip joint implant products "should be imputed to Zimmer." (Pl. Mem. of Law in Opp'n 9.) Such allegations are found nowhere in the First Amended Complaint. As a threshold matter, "Plaintiff[s'] cannot amend [their] already amended complaint 'by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss.'" Morales v. City of New York, 59 F. Supp. 3d 573, 581 (S.D.N.Y. 2014) (quoting K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197,

209 n.8 (S.D.N.Y. 2013)).

Moreover, where allegations of agency are pleaded in connection with a fraud claim, they, too, must be pled with particularity in accordance with Rule 9(b). See Meisel, 651 F. Supp. 2d at 111 n.6 (citing cases). Plaintiffs' "unsupported statement that [Dr. Petraco] acted as an agent on behalf of [Defendants] is insufficient to allege an agency relationship encompassing the authority to make allegedly fraudulent statements." Id. at 121 (citing Schwartz v. Soc'y of the N.Y. Hosp., 605 N.Y.S.2d 72, 73 (1st Dep't 1993). Plaintiffs have not pled any facts from which the Court can infer that Defendants controlled Dr. Petraco's allegedly fraudulent actions. See Meisel, 651 F. Supp. 2d at 121 (citation omitted). Accordingly, Plaintiffs' attempt to rely on an agency theory of fraudulent and negligent misrepresentation fails as well.

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to Plaintiffs' claims for fraudulent misrepresentation and negligent misrepresentation and those claims are hereby dismissed.

III.    Breach of Express Warranty

Under New York law, "[a] successful claim of breach of express warranty requires proof that an express warranty existed, was breached, and that plaintiff had relied on that warranty." Cavanah v. Ford Motor Co., No. 13-CV-4584, 2014 WL 2048571, at *4 (E.D.N.Y. May 19, 2014) (quoting Reed v. Pfizer, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012)). Such claims are subject to a four-year statute of limitations "from tender of delivery." Guisto v. Stryker Corp., 293 F.R.D. 132, 137 (E.D.N.Y 2013) (citing N.Y. U.C.C. § 2-725(1)); see also Schwatka v. Super Millwork, Inc., 965 N.Y.S.2d 547, 549-50 (2d Dep't 2013). However, "where a warranty

explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance," then "the cause of action accrues when the breach is or should have been discovered." Schwatka, 965 N.Y.S.2d at 550 (citing N.Y. U.C.C. § 2-275(2)).

Plaintiffs' express warranty claim fails for two reasons. First, the claim is time-barred. Plaintiffs' express warranty claim expired four years from the tender of delivery, i.e., when Bruno received the hip implant. Bruno's surgery took place on June 1, 2010. Therefore, the statute of limitations on the express warranty claim expired on June 1, 2014. Plaintiffs did not commence the within action until October 26, 2015, a year and a half after the expiration of the statute of limitations. Moreover, nothing in the First Amended Complaint alleges that the future performance exception should apply here. The only reference to future performance is that Defendants warranted that "[t]he hip implant would not fail during normal usage and would perform for its proper use in the future." (1st Am. Compl. ¶ 144(B).) "A warranty of future performance is one that guarantees that the product will work for a specified period of time." Schwatka, 965 N.Y.S.2d at 550 (citations omitted). Plaintiffs' vague allegations of future warranty do not state an exception to the four-year statute of limitations.

Moreover, Plaintiffs fail to adequately allege that any express warranty was breached by Defendants. Rather than identifying any specific warranty that Plaintiffs relied on, the First Amended Complaint contains the same laundry list of representations allegedly made by Defendants in connection with Plaintiffs' misrepresentation claims. However, Plaintiff does not identify the specific terms of any purported warranty. Rather, in response to Defendants' motion to dismiss, Plaintiffs argue that dismissal is premature because "at this stage in the litigation, Plaintiffs do not have access to the documentation distributed by the Defendants pertaining to

warranties" applicable to the hip joint implant products Plaintiff received. (Pl. Mem. of Law in Opp'n 11.) Without being able to identify the specific warranty Defendants are alleged to have made, Plaintiffs cannot establish that they relied on any such warranty, a necessary element of an express warranty claim. Moreover, discovery is not a fishing expedition for Plaintiffs to obtain information to try and create claims that do not already exist. In order to properly state a claim, Plaintiffs need to have adequate information in their possession at the time they file their complaint to substantiate the claim against a motion to dismiss. This, Plaintiffs have failed to do. "Where a 'Plaintiff does not identify the terms of the purported warranty he claims to have relied on,' any 'conclusory allegation . . . for breach of express warranty [must] be dismissed.'" Cavanagh, 2014 WL 2048571, at 4 (quoting Goldin v. Smith & Nephew, Inc., No. 12-CV-9217, 2013 WL 1759575, at *6 (S.D.N.Y. Apr. 24, 2013)) (alteration in original) (additional citation omitted).

For the foregoing reasons, Defendants' motion is granted and Plaintiffs' claim for breach of express warranty is dismissed.

IV.     Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under New York law, a plaintiff must demonstrate "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) (citing Howell v. New York Post Co., 81 N.Y.2d 115, 121 (1993)). For liability to incur, the conduct must be "so outrageous in character, and so

-11-

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Stuto, 164 F.3d at 827 (citing Howell, 81 N.Y.2d at 122) (additional citations omitted). "Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance." Stuto, 164 F.3d at 827 (citing Restatement (Second) of Torts, § 46 cmt. h) (additional citation omitted).

The Court finds that none of the actions by Defendants alleged in the First Amended Complaint meet the standard for extreme and outrageous conduct. This is a products liability action, not an intentional infliction one. Plaintiffs cite to the alleged recalls of Defendants' products as support for their intentional infliction claim. However, even construing the First Amended Complaint in the light most favorable to Plaintiffs, as the Court must, there is nothing conscience shocking, atrocious or utterly intolerable pleaded in the First Amended Complaint.

Moreover, as Defendants point out - and Plaintiffs fail to address in their opposition - "under New York law, an intentional infliction tort may be invoked only as a last resort . . . to provide relief in those circumstances where traditional theories of recovery do not." Salmon v. Blesser, 802 F.3d 249, 256 (2d Cir. 2005) (citations and internal quotation marks omitted). In fact, the "New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct 'falls well within the ambit of other traditional tort liability.'" Id. (quoting Fischer v. Maloney, 43 N.Y.2d 553, 557-58 (1978)). "All four Appellate Division courts have answered the question and held that it cannot." Salmon, 802 F.3d at 256 (collecting cases).

Here, since there are other tort remedies available to Plaintiffs even after the dismissal of

the claims herein, they cannot invoke a claim for intentional infliction of emotional distress as well. Accordingly, Defendants' motion is granted and Plaintiffs' intentional infliction of emotional distress claim is dismissed.

V.      Punitive Damages

Plaintiffs' final cause of action asserts a claim for punitive damages. "New York law does not recognize a separate cause of action for punitive damages." Erlich v. Inc. Vill. of Sea Cliff, 945 N.Y.S.2d 98, 101 (2d Dep't 2012) (citing Rocanova v. Equitable Life Assurance Soc'y of U.S., 83 N.Y.2d 603, 634 (1994)); see also Henry v. Concord Limousine, Inc., No. 13-CV-494, 2014 WL 297303, at *5 (E.D.N.Y. Jan. 24, 2014) ("[I]t is well settled under New York law that punitive damages may not be asserted as a separate cause of action."). This final claim is therefore dismissed; however, Plaintiffs may still seek punitive damages in connection with any appropriate causes of action that remain. See Melvin v. County of Westchester, No. 14-CV-2995, 2016 U.S. Dist. LEXIS 41120, at *80 (S.D.N.Y. Mar. 29, 2016) (citing cases).

VI.     Leave to Replead

Although not requested in the within motion, by letter motion dated August 24, 2016, Plaintiffs request leave to amend their complaint. The Court notes that Plaintiffs have amended their complaint once already in response to Defendants' request for a pre-motion conference in which Defendants highlighted the deficiencies in the complaint. Accordingly, Plaintiffs now seek leave to amend their complaint a second time. While the Court is skeptical as to the merits of any such motion, given the pleading failures identified in the within decision, Plaintiffs will be

afforded the opportunity to make a motion to amend. However, Plaintiffs should be mindful of the pleading deficiencies found by the Court in this decision and should carefully scrutinize whether to replead all of the dismissed claims. Any such motion to amend will be handled by the assigned Magistrate Judge.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted and Plaintiffs' fourth, fifth, sixth, seventh and ninth causes of action are dismissed. Plaintiffs are granted leave to make a motion to amend their complaint a second time, which will be handled by the assigned Magistrate Judge, as set forth above.

**SO ORDERED:**

Dated: Central Islip, New York
August 26, 2016

_____/s/_____
LEONARD D. WEXLER
United States District Judge